**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MIGUEL BENITO CAMPOMANES
FLORES,

         Petitioner,

                                     Case No. 3:18-cv-160-J-34JBT

vs.

MARIA FERNANDA ORBEGOSO ELIAS-
ARATA,

         Respondent.

_____/

# O R D E R

    **THIS CAUSE** is before the Court on the Verified Petition for Return of Minor Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent (Doc. 1; Verified Petition), filed on January 25, 2018.  Petitioner filed the Verified Petition pursuant to The Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, as implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq.[1]  In the Verified Petition, Miguel Benito Campomanes Flores (the Father), a citizen and resident of Peru, requests the return of his child, J.C.O. (the Child), from the United States to Peru. See Verified Petition at 2, 4-5.  Respondent Maria Fernanda Orbegoso Elias-Arata (the Mother), the Child's mother, filed an answer to the Verified Petition on February 16, 2018. See Answer and Affirmative Defenses (Doc. 13; Answer).  At present, the Child lives with the Mother in Fernandina Beach, Florida at the home of the Child's maternal grandmother. Although the parties attempted to resolve this case through mediation, see Notice of

---

[1] ICARA was previously located at 42 U.S.C. § 11601.

Mediation Conference (Doc. 21),[2] ultimately, the matter came before the Court for an evidentiary hearing on June 11-12, 2018.  <u>See</u> Minute Entry (Docs. 35, 38; the Hearing). The Mother and Father appeared in person with their counsel at the Hearing.  <u>See</u> Minute Entry (Doc. 35).  Over the course of the two-day Hearing, the Court heard in-person testimony from both parties and the Child's maternal grandfather, as well as the testimony via videoconference of the Child's former nanny in Peru.  <u>Id.</u>  By agreement of the parties, and largely without any corresponding testimony from the witnesses, the Court also received numerous documentary exhibits into evidence.  <u>Id.</u>  Both parties submitted trial briefs prior to the Hearing, and at the conclusion of the Hearing, counsel presented oral closing arguments.  <u>See</u> Petitioner's Trial Brief (Doc. 31), filed June 6, 2018; Respondent's Trial Brief (Doc. 32), filed June 8, 2018; Minute Entry (Doc. 38).  Accordingly, this matter is ripe for review.

## I.      Background

The Father and Mother, both citizens of Peru, first met in high school when they were fifteen years old.  Now in their late twenties, the parties have had a relationship over the last thirteen years with frequent break-ups and reconciliations.  During the course of their on-again, off-again relationship, the parties had a son together, the Child, who was born in Peru in January of 2013.  After the Child's birth, during the time periods when the Mother and Father were not a couple, the parties divided the parenting responsibilities and the Child spent time with both parents.  The Mother lived in an apartment owned by the

---

[2] The Court expresses its appreciation to mediator Douglas Frenkel for his pro bono services in this case.

Father's mother, and the Father lived with his parents.  Both the Mother and Father worked, and a nanny, Ana Victoria Sanchez del Castillo, cared for the Child during the week.  On two occasions, when they were eighteen years old, and again shortly before the events of this lawsuit, the parties had plans to get married.  However, in May of 2017, the Father called off the wedding and terminated the relationship.

The Mother has long desired to move to the United States.  Her mother is a United States citizen living in Fernandina Beach, Florida, and her father, who lives in Miami, Florida, has been a legal permanent resident of the United States since 2013.  In 2010, during a time when the Mother and Father were not in a relationship, the Mother began the process of obtaining legal permanent resident status in the United States.  When the Mother and Father reconciled a few months later, the Mother informed the Father of her pending permanent resident application.  Later, when the Mother was pregnant with the Child, the Mother reminded the Father of her application for permanent resident status in the United States.  In 2016, the parties agreed to include the Child in the Mother's application for permanent resident status, and the maternal grandfather assisted with this process.  The United States granted the Mother's petition at some point in early 2017.  See Evidentiary Hearing Vol. I Transcript (Doc. 41; Vol. I Tr.) at 79; Pet. Exs. 4-5.

Although it is unclear from the record when these plans began, at some point the parties agreed that the Child would travel with the Mother to the United States in June of

3

2017.[3]  As such, in May of 2017, the Mother purchased a round-trip ticket from Lima, Peru, to the United States, and back to Peru.  In addition, on May 15, 2017, the Mother and Father executed and notarized a form titled "Consent for Children Travelling Abroad."  <u>See</u> Pet. Ex. 1 (Consent to Travel Form).  The Form states that in accordance with Peruvian law, the Father and Mother "hereby give consent for their 4-year old son [the Child] to travel from Peru to the United States of America and back by air (Avianca Airline)."  <u>Id.</u>  According to the Consent to Travel Form:

> It is hereby stated for the record that the Child will travel with [the Mother]; she will take care of the Child during the stay in the destination above. Likewise, the appearing parties declare to know that this consent is valid for 90 (Ninety) Days after the issuance date.  The minor will travel to the United States on June 13, 2017 and return to Peru on August 25, 2017.

<u>Id.</u>  The parties selected a return date of August 25, 2017, so that the Child could spend the Father's August 26th birthday with him.  Prior to her departure, the Mother quit her job, and disposed of her furniture and other belongings.  On June 10, 2017, the Mother moved out of the apartment where she was living.  On June 12, 2017, the day before she was set to depart for the United States with the Child, the Mother filed a domestic violence claim against the father.[4]

---

[3] The Court heard some limited testimony that the original travel date was July 15, 2017, but that, at the Mother's request, the parties changed the date to June 13, 2017, after they broke-up.  <u>See</u> Vol. I Tr. at 106. Significantly, this evidence suggests that the parties originally planned the trip to the United States <u>prior</u> to the breakdown in their relationship.

[4] Neither party elicited any testimony from the Mother as to why she filed this domestic violence claim. According to the Father, he did not find out about the existence of this claim until October of 2017.  The court did grant some initial protective measures to the Mother and the Father appealed this decision.  <u>See</u> Pet. Exs. 9-10. The evidence in this case does not reveal the outcome of the Father's appeal.  Although the Father

On June 13, 2017, the Mother and Child traveled to the United States and have not returned to Peru since, remaining instead at the Child's maternal grandmother's house in Fernandina Beach, Florida. Soon after moving in with the maternal grandmother, the Mother furnished a room for the Child, started working, and enrolled the Child in daycare, all with the Father's knowledge and without his objection. Indeed, the Father communicated frequently with the Mother using Facebook Messenger, and stayed in regular contact with the Child. However, in July of 2017, a disagreement arose between the parties regarding the Child's future and as a result, the Mother filed a petition in Peru for the "Change of Residence of a Minor." See Resp. Ex. 1 (Change of Residence Petition).[5] In the Change of Residence Petition, the Mother petitioned the Peruvian court for "the change of regular residency of [the Child], who is four (04) years old, changing his address from the Republic of Peru to the United States of North America." Id. at 2. After the Mother and Child failed to return to Peru in August as scheduled, the Father filed a request on October 2, 2017, for the international return of the Child with the Peruvian Central Authority for the application of the Hague Convention. See Pet. Ex. 2. The Verified Petition followed in January. In the Verified Petition, the Father contends that the Mother

_____

presented an exhibit titled "Revocation of Domestic Violence Order dated October 4, 2017 (filed 5/24/18)" the Father never moved the exhibit into evidence and therefore, the Court does not consider it.

[5] Although the record is unclear, it appears from the testimony at the Hearing that the Mother's initial Change of Residence Petition was unsuccessful, and she subsequently filed another Petition. See Vol. I Tr. at 53, 67. Indeed, the parties agree that the Mother filed a Change of Residence Petition in July, but the Petition admitted into evidence is dated October 5, 2017. Resp. Ex. 1. The Mother's testimony indicates that this Petition is still pending in Peru. See Vol. I Tr. at 162.

either wrongfully removed the Child from Peru under false pretenses, or is unlawfully retaining the Child in the United States without the Father's consent.

## II.    Applicable Law

### A.  Prima Facie Case

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  See Convention, pmbl.  "The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings."  See Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007).  As such, "[t]he court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle."  See Ruiz v. Tenorio, 392 F.3d 1247, 1250 (11th Cir. 2004).  The Hague Convention "applies to children under sixteen years of age who are 'habitually resident' in a contracting state (Convention, Art. 4) and are 'wrongfully removed' to another contracting state (Convention, Art. 1)." Seaman v. Peterson, 766 F.3d 1252, 1257 (11th Cir. 2014).[6]  A removal is "wrongful" within the meaning of the Hague Convention where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

---

[6] It is undisputed that both the United States and Peru are contracting states to the Hague Convention.

> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

See Convention, Art. 3. The petitioner bears the burden of establishing by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." See 22 U.S.C. § 9003(e)(1)(A). If a petitioner establishes a wrongful removal or retention, then "the authority concerned shall order the return of the child forthwith," unless the respondent establishes one of the affirmative defenses enumerated in the Convention. See Convention, Art. 12; see also Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008).

To prevail on the Verified Petition, the Father must establish that: (1) the Minor Child was "habitually resident" in Peru at the time the Mother removed him from Peru or retained him in the United States; (2) the removal or retention was in breach of the Father's custody rights under Peruvian law, and (3) the Father had been exercising those rights at the time of removal or retention. See Ruiz, 392 F.3d at 1251. In this case, there is no legitimate dispute that the Father has custody rights with respect to the Child under Peruvian law and that the Father was regularly exercising those rights prior to the removal.[7] Additionally, the

_____

[7] At the conclusion of the Father's case-in-chief, the Mother moved to "dismiss" the Verified Petition because the Father failed to present any evidence that he has custody rights under Peruvian law. Notably, the Mother did not challenge the Father's custody rights in her Trial Brief, nor did she identify this issue when the Court summarized the matters in dispute at the outset of the Hearing. See Vol. I Tr. at 7. Regardless, the Court denied this motion as there is ample evidence that the Father has custody rights to the Child within the

parties agree that the Child is under the age of sixteen, was born in Peru, and had lived his entire life in Peru until June 13, 2017. Nonetheless, the Mother contends that the Father cannot satisfy his prima facie case because Peru is not the Child's habitual residence. According to the Mother, prior to the purported wrongful removal or retention, the parties "shared a settled intent for the Child to abandon Peru and take up a new residence in the United States." See Respondent's Trial Brief at 13.

Neither the Hague Convention nor ICARA define the term "habitual residence." See Ruiz, 392 F.3d at 1252. The term is intended to be free from "'technical rules, which can produce rigidity and inconsistencies as between legal systems.'" See id. (quoting In re Bates, No. CA 122.89 at 9-10, High Court of Justice, Fam.Div'n Ct. Royal Court of Justice, United Kingdom (1989)). Generally, a habitual residence requires only that "'the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'" Id. Recognizing the limited usefulness of such generalities, the Eleventh Circuit has adopted the approach set forth by the Ninth Circuit in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001) for determining a child's habitual residence. See Ruiz, 392 F.3d at 1252.

---

meaning of the Hague Convention. See Minute Entry (Doc. 38); Evidentiary Hearing Vol. II Transcript (Doc. 42; Vol. II Tr.) at 18-19; see also Hanley v. Roy, 485 F.3d 641, 645 (11th Cir. 2007) ("The Convention broadly defines 'rights of custody' as 'rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" (quoting Convention, Art. 5)). Specifically, the Court relied on the Consent to Travel Form executed by the parties prior to the Child's departure, see Petitioner's Ex. 1, and the Mother's Change of Residence Petition in Peru, see Respondent's Ex. 1, both of which indicate that the Father, at the very least, has the joint right to decide the Child's country of residence. See Vol. II Tr. at 18-19. Absent any evidence to the contrary, the Court remains convinced at this time that the Father has custody rights under Peruvian law with respect to the Child. See Abbott v. Abbott, 560 U.S. 1, 10 (2010) (holding that a ne exeat right, i.e., a right to consent before the other parent may take a child to another country, is a right of custody under the Hague Convention). Indeed, the Court's prior determination is further supported by the Mother's own testimony in which she acknowledged that, absent a court order, she could not remove the Child from Peru without the Father's consent. See Vol. I Tr. at 161-63.

According to Ruiz and Mozes, "[t]he first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." Id. (citing Mozes, 239 F.3d at 1075). Significantly, it is "'the person or persons entitled to fix the place of the child's residence'" whose intention or purpose must be considered. Id. at 1253 (quoting Mozes, 239 F.3d at 1076). However, "when the persons entitled to fix the child's residence do not agree on where it has been fixed," as in this case, the analysis is more difficult. Id. The courts discussed three different factual scenarios in which such a disagreement may arise, and observed that the more difficult cases occur where the parents agreed to a child's stay abroad for a period of ambiguous duration. Id. In such cases, the courts reasoned:

> "Sometimes the circumstances surrounding the child's stay are such that despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence. Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred."

Id. (quoting Mozes, 239 F.3d at 1077-78).

However, while crucial, the settled intention of the parents alone cannot transform the habitual residence. Id. Instead, there must also be "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized." Id. Nonetheless, where parental intent is uncertain or contrary, courts must be "slow to infer" a change in habitual residence based on the level of a child's contact with the new country, such as in school or with friends. Id. at 1253-54. Because children can be "remarkably adaptable," the significance of such contacts is difficult to discern and "'[t]he

greater the ease with which habitual residence may be shifted without the consent of both parents, the greater the incentive to try.'" Id. at 1254 (quoting Mozes, 239 F.3d at 1079). Last, the Ruiz and Mozes cases instruct that:

> when there is no shared settled intent on the part of the parents to abandon the child's prior habitual residence, a court should find a change in habitual residence if the objective facts point unequivocally to a new habitual residence, or if the court could "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring a return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed."

Id. at 1254 (quoting Mozes, 239 F.3d at 1081).

## B. Affirmative Defenses

As stated above, the Hague Convention also provides certain affirmative defenses to the return of a child. See Baran, 526 F.3d at 1344-45. "These affirmative defenses are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return." Id. at 1345. Two of the defenses require clear and convincing evidence:

> 1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms."

Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007) (alteration in original) (quoting Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001)). The other two defenses may be established by a preponderance of the evidence:

> (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country, and (2) that the

10

> petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal.

Id. at 668-69.  Here, the Mother raises the affirmative defenses of consent or acquiescence.

See Respondent's Trial Brief (Doc. 32) at 16-18.  Specifically, the Mother maintains that prior to the Child's departure the Father consented to the Child's permanent relocation to the United States, or, after the Child's arrival in the United States, the Father acquiesced to the Child remaining here.

If the Father establishes a prima face case for return of the Child, the Court may decline to order the return if the Mother establishes by a preponderance of the evidence that the Father "had consented to or acquiesced in the removal or retention."  See Hague Convention, Art. 13(a).  The defenses of consent and acquiescence are narrow defenses that turn on the subjective intent of the parent who is alleged to have consented or acquiesced.  See Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).  These defenses are nonetheless analytically distinct in that "[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  Id.  The defense of "acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'"  Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996)).  Although "[c]onsent need not be expressed with the same degree of formality," id., it is still important to consider what the petitioner actually contemplated and agreed to, including the nature and scope of

any consent given, and any conditions or limitations placed on that consent. Id. Significantly, "[t]he fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." Id.

## III.    Discussion

Prior to June 13, 2017, the Child had lived in Peru his entire life. As such, unless the Child's habitual residence changed when he came to the United States in June of 2017, the Child's habitual residence remains in Peru. See Mozes, 239 F.3d at 1077 (instructing that a change in habitual residence "requires an actual change in geography" (internal quotation omitted)). The Father maintains that the Child's habitual residence is Peru because the Child's visit to the United States was intended to be for only a limited period of time, and the Mother unilaterally decided to keep the Child in the United States. The Mother contends that the Child's habitual residence changed to the United States because, according to her, the parties shared a settled intent that the Child live in the United States as of June 13, 2017. In addition, the Mother asserts that return is not warranted, even if the Child's habitual residence is Peru, because the Father consented or acquiesced to the Child living in the United States. Thus, whether framed as a question of habitual residence, or as one of consent/acquiescence, the factual dispute at the heart of this case is whether the Father intended for the Child to live in the United States as of June 13, 2017, or

thereafter acquiesced to this arrangement.[8]  The parties' differing accounts of the June 13, 2017 trip are as follows.

According to the Father, he agreed that the Child could visit the United States for the roughly two-month period from June 13, 2017, to August 25, 2017, as is documented on the Consent to Travel Form.  The Father testified that when the Child returned to Peru in August, he was going to resume his studies there, and the parties would then plan the Child's next trip to the United States.  See Vol. I Tr. at 107.  The Father further testified to his understanding that the Mother had not yet decided whether, after the Child returned to Peru, she would remain in Peru as well, or return to the United States.  Id. at 94.

The Father maintains that the Mother first told him that she would not return to Peru with the Child via Facebook in July of 2017.  The Father tried to convince the Mother to return on the agreed upon date, but the Mother refused, and at some point in July or

---

[8] Notably, a change in habitual residence can also occur without shared intent where a child's life has become "so firmly embedded in the new country as to make it habitually resident even though there be lingering parental intentions to the contrary."  See Mozes, 239 F.3d at 1078.  However, the Mother does not contend that the objective facts are sufficient to establish the abandonment of Peru and a new habitual residence in the United States even without the Father's agreement.  Indeed, "in the absence of settled parental intent, courts should be slow to infer from [the child's contacts with the new country] that an earlier habitual residence has been abandoned."  Id. at 1079.  At the latest, the purported wrongful retention occurred on August 25, 2017, when the Child did not return to Peru as scheduled.  Thus, even if the Mother had raised this argument, the Child's mere seventy-three days in the United States prior to the retention make it exceedingly unlikely that the four-year-old Child's life was so "firmly embedded" in the United States as to create a new habitual residence absent shared parental intent.  See id. at 1078.

The Court also notes that even with shared intent, a change in habitual residence typically requires "the passage of '[a]n appreciable period of time'" in the new country "'sufficient for acclimatization.'"  See Mozes, 239 F.3d at 1079 (internal citation and quotations omitted).  However, the Father, insisting that he never agreed to a permanent move, does not argue in the alternative that the Court could also reject a change in habitual residence based on a lack of sufficient time and acclimatization.  As such, for purposes of determining whether a change in habitual residence has occurred in this case, the Court focuses its analysis solely on the intentions of the parents.

13

August, the Mother told the Father that she had filed the Change of Residence Petition. According to the Father, the Mother refused to return to Peru unless the Father signed an agreement allowing the Child to live in the United States permanently, which he initially refused to do. Eventually, in an attempt to gain the return of the Child, the Father told the Mother he would sign the paperwork allowing the Child to live in the United States, but only if the Mother brought the Child back to Peru first. The Father testified at the Hearing that he was desperate and did not actually intend to sign the paperwork had the Mother returned to Peru. When it became clear to him that the Mother was not going to let the Child return, the Father attempted to obtain a visa to travel to the United States but his application was denied. The Father then sought a remedy under the Hague Convention.

The Father concedes that he had agreed to allow the Child to obtain permanent resident status in the United States, and understood that, in order to keep that status, the Child would need to spend time in the United States. However, the Father testified to his understanding that the Child would live in Peru and travel to the United States at least once every six months, during the summer, mid-year, and end-of-the-year breaks, in order to maintain his residency status. See Vol. I Tr. at 90-93. The Father does believe it is beneficial to the Child to have permanent resident status in the United States and he does not want the Child to lose that status. Id. at 93. Nonetheless, the Father insists that he told the Mother on many occasions prior to the trip that he did not consent to the Child living permanently in the United States, id. at 100-01, and according to the Father, the

parties had an ongoing disagreement about the coordination of the Child's studies between the United States and Peru, id. at 105-06.[9]

The Mother's version of events differs from the Father's in significant respects. The Mother maintains that the purpose of the June 13, 2017 trip to the United States was to move here permanently with the Child. According to the Mother, throughout the course of her relationship with the Father, she was always open about her pending application for permanent resident status and her intention to move to the United States. In addition, the Mother testified that after she became pregnant she reminded the Father of her intention to live in the United States, and he told her: "'Yes. Don't worry about that. We will arrange that.'" See Vol. I Tr. at 145. Indeed, the Mother asserts that she and the Father agreed to include the Child in her permanent resident application because they intended for the Child to live in the United States.

As to the June 13, 2017 trip, the Mother testified that she told the Father that the purpose of this trip was to move to the United States. According to the Mother, she quit her job, disposed of her furniture, and moved out of the apartment because she was moving to the United States permanently with the Child. Likewise, the Mother obtained a job in the United States, enrolled the Child in daycare here, and furnished a room for the Child at the

_____

[9] The Father's version of events is supported by the testimony of the Child's former nanny, Ana Victoria Sanchez del Castillo. Sanchez testified to her understanding that the Child was going on a vacation and would return in August, at which time Sanchez would resume her role as the Child's nanny. According to Sanchez, the Mother told her she was moving out of the apartment and getting rid of her furniture because after the Child returned to Peru in August, the Mother was going back to the United States until December, when she would return to Peru to see the Child and take him on vacation. Sanchez is currently employed by the Father's family and testified that she was unaware of the Child's pending application for permanent resident status in the United States.

grandmother's house in Fernandina Beach, Florida. The Mother insists that the Father's awareness of these activities demonstrates his knowledge of the move's permanence. Specifically, the Mother testified that the "initial plan" was "that my [C]hild would remain permanently here [in the United States], begin school, and that I would visit him with my [C]hild in Peru. So the initial plan was that the [C]hild would live here and . . . we would coordinate the visits to Peru in accordance to his schooling and my job." Vol. I Tr. at 151.

The Mother conceded that she did initially intend to return to Peru in August of 2017, as shown on the Consent to Travel Form, but maintains that this return trip was only temporary, to allow the Child to spend the Father's birthday with the Father, and they were to return to the United States thereafter. See Vol. I Tr. at 147 ("I was planning to be a few weeks in Peru so he could be with his son. And after that I would return to the United States, because I had to go back to my work and my child had to go back to school.") The Mother explained that when they returned to Peru in August, "[t]he plan was that he would give me a new permission so I could return to the United States so my son could continue school and I my job." Id. at 157. She elaborated on the use of a short-term travel permit as follows:

> The agreement that we had was that the traveling permits would be for a short period of time, so [the Father] always would know when we would return to the Peru, so for – the son could visit his father, so he would have the certainty, knowing a date when he would know, 'Okay. This date I will be able to see my son for the next two weeks.' So that's why we had the short permits. If we had a long permit, and then if he broke up with me or I broke

16

up with him, then I would be here and there would be no obligation for me to return, because I would have already this permission.

Id. at 160-61.[10]

The Mother testified that in July of 2017, a disagreement arose between the parties because the Father sought to change the plan and have the Child study for at least two years in Peru. Id. at 151-52. In light of this disagreement, the Mother decided not to return to Peru in August of 2017, as initially scheduled, because she was afraid "of having, again, a discussion with him and not being able to follow our initial plan," specifically, the plan "for the child to stay here and study here [in the United States]." Id. at 152. The Mother was concerned the Father would not sign another consent to travel form and she would be unable to leave Peru with the Child. Id. at 161-62. The Mother explained that she "was afraid that we would have an argument about that. And I cannot stay in Peru. I don't have a job there. I have sold everything." Id. at 152. According to the Mother, she decided to file the Change of Residence Petition as a result of this disagreement so she would no longer need the Father's permission to travel with the Child.[11]

---

[10] Notably, the agreement the Mother refers to here appears to be one that existed prior to the parties' break-up in May of 2017. Her testimony does not address what the parties' understanding was at the time of the departure in June of 2017. The Father's insistence on only short-term travel permits before the couple broke-up is entirely inconsistent with a suggestion that he would have agreed to a long-term move after the relationship ended.

[11] The Mother's version of events is supported to some degree by the testimony of the maternal grandfather, Fernando Orbegoso Rincon, who testified that the Mother told him the purpose of the June 13, 2017 trip was "[t]o establish residency, start a new life here." See Vol. I Tr. at 128; see also id. at 136 ("They were coming – they were moving here. They were coming to live here."). The grandfather also testified that he was aware that the Mother had signed the temporary Consent to Travel Form, and explained: "that was an agreement entertained by them. And they . . . they were talking about it. Allegedly, she was going to return and they were going to sign another agreement. But then there were some differences." Id. at 133. The grandfather

Although the parties' testimony conflicts, the documents submitted into evidence during the Hearing support only one version of events. Before discussing this evidence, the Court reiterates its observation, made at the close of the Hearing, that the parties submitted these documents into evidence largely without any corresponding testimony from the witnesses. See Evidentiary Hearing Vol. II Transcript (Doc. 42; Vol. II Tr.) at 14-15. Absent any testimony about the exhibits, the parties left it entirely to the Court to draw its own inferences as to the meaning and import of this evidence. Notably, several of the exhibits are excerpts from the Facebook messages exchanged between the parties from June through August of 2017. Without any explanatory testimony from the parties, the Court is often unable to determine the context which lead to the particular exchange placed in evidence, and it is often unclear what a party may have meant by his or her statement. This lack of clarity is compounded by the fact that the messages were written colloquially in a foreign language.[12] Nonetheless, despite the lack of context or explanation, upon

---

further testified that the Mother decided not to return to Peru in August as previously scheduled due to the conversations that she had with the Father because "[h]e changes his mind." Id. at 134.

[12] At the conclusion of the Hearing, the Court noted on the record that the translations of the Facebook messages admitted into evidence as Respondents Exhibits 2 through 2X were problematic. See Vol. II Tr. at 7-14. The Court had reviewed the messages and found several places where the translations simply made no sense. See, e.g., Resp. Ex. 2M; Vol. II Tr. at 8-9. Uncertain as to the reliability of the translations, and recognizing the critical importance of this evidence, the Court directed counsel for the Mother to submit an electronic version of these messages to the Court and the Court selected its own translator to translate the messages anew. This translation of the messages is in the record as Court's Exhibit 2 (Doc. 46). In an abundance of caution, the Court gave the parties an opportunity to object to the accuracy of the Court's translation. See Endorsed Order (Doc. 47). Neither party identified any inaccuracy or objected to the new translations. See Joint Notice of Parties (Doc. 52). For ease of reference, the Court will cite a particular message using the Mother's exhibit numbers, but the Court relies solely on the Court's Exhibit for the translations of Respondent's Exhibits 2- 2X. The Court also raised a concern with the parties about the dates associated with these messages. Although the Mother listed dates on her exhibit list, the dates are not always discernable from the messages themselves. At the Court's request, the parties filed a Joint Stipulation (Doc. 40) on June 21, 2018, in which they stipulated to the dates of the various messages.

careful review of the exhibits, the Court is convinced that the parties never reached an agreement, either before or after the Child's departure from Peru, about where the Child should live.

The Facebook exchanges between the parties in early June of 2017 show that the Father did know that the Mother had disposed of all her furniture, and moved out of the apartment in Peru. The parties also discussed canceling the Mother's Peruvian cell phone account. In addition, the Mother sent pictures to the Father of the Child's furnished room at the maternal grandmother's house, and informed him that she had obtained a job and enrolled the Child in daycare. Because the Father does not appear to question or object to the Mother's actions, these initial messages could indicate that the Father understood the trip to be permanent. However, this inference is undermined by the messages that follow. On July 3, 2017, the Mother sent the Father the following message:

> I have been thinking quite a bit and I think that [the Child] should study here at least a couple of years, in case you want him to study there some time, it could be for one or two years, but it would be best that the majority of his studies are completed here, I am not opposed to him studying there for a couple of years, it will allow him to compare the countries and decide what he wants to do later, but I want what is best for my son and I think and I am sure that it is this. Since you and your family are a little wrong, I will repeat it again: it has never been my intention to prevent [the Child] from seeing you or all of you, [the Child] can go to Peru as many time as you want, I don't oppose to that [sic], I only care for his future and it is better here, there are millions of things that no matter how much you want it, you won't be able to give him there and I think that deep inside you know it well, it is just that you don't have the courage to accept it. I am his mom and my opinion

---

The Court also notes that Respondent submitted "WhatsApp Text Messages" as Exhibit 3. <u>See</u> Resp. Ex. 3. These messages have no discernible dates at all, appear to both pre- and post-date the Child's trip to the United States, and overlap to some degree with the Facebook messages submitted as Respondent's Exhibits 2-2X. Devoid of all context, and without any explanation as to when these messages were sent, the Court is unable to place any weight on the evidence presented as Respondent's Exhibit 3.

counts even more than yours, however, I have always consulted you and kept you informed of him. The best for [the Child] is that BOTH of us and I say both because it only concerns you and me, NOT your mom, your dad, you and me, that we reach a REASONABLE AGREEMENT WHERE THE ONLY GOAL SHOULD BE WHAT IS BEST FOR [THE CHILD], mainly for his wellbeing. Think about it calmly. I hope that we can reach an agreement.

<u>See</u> Resp. Ex. 2L. The Father responds that "[the Child] can study there, I have not denied it" and the rest of the conversation is cut out of the Exhibit. Five days later, on July 8, 2017, the conversation continues as follows:

Father: Mafer,[13] I don't understand
I gave my permission for him to go to the USA
Mother: <u>Hey, What permission</u>.
<u>For Two months</u>
<u>And then you want to take him</u>
Father: Three months
and a bit more
Mother: And force me to wait patiently until you feel like [sic] before I can see him again
Father: I don't want to keep him
Mother: <u>What is the approval?</u>
<u>What is the agreement on that?</u>
<u>Because I can't see it</u>
Father: We have not talked about that and you are assuming things
Mother: It's not even 3 month[s].
Engineer…
I am not assuming anything.
Father: I told you that I think that it is perfect that he has the residency and that he can make use of it
<u>That is why the idea is that he goes there there [sic] 3 times per</u>
<u>year</u>
Mother: I am telling you [THE CHILD] SHOULD STUDY HERE BECAUSE IT IS BEST FOR HIM, that if you want you can take him to study there a couple of years but not an 80% there. Who can think something like that, please. No matter how you see it, this country is much better than Peru. You don't even spend time with [the

---

[13] "Mafer" is a nickname for the Mother, a shortened version of her name, Maria Fernanda. <u>See</u> Vol. I Tr. at 106.

20

Child]. I mean I really have a list of things to say and why [the Child] should study here.

See Resp. Ex. 2M (emphasis added). The parties continue to argue over whether the Child should spend the first three years of elementary school in the United States or Peru. See Resp. Ex. 2N, 2O. At one point the Mother appears to suggest that the Father's wishes "will take away his residency." See Resp. Ex. 2O. The Father then references having the Child "travel[ ] back and forth during the year as we thought," and insists that "No one wants to take away his residence." Id. The Mother attempts to shut down the argument by stating: "You know what Miguel // Bye // We can never reach an agreement // . . . I tried // . . . But that is impossible // I will [not] let you to take [sic] care of him when he is so little." Id. (emphasis added).

Notably absent from the foregoing exchanges is any reference to a prior agreement between the parties. The Mother declares that she has been thinking and has decided the Child should remain in the United States, and she expresses her wish that the parties come to an agreement in that regard, not that they adhere to an agreement they had made in the past. While it is apparent that this is not the first time the parties have discussed whether the Child should live in the United States, the Mother gives no indication that the Father previously agreed to a permanent or even an indefinite move. Indeed, the Mother expressly acknowledges that the parties have never reached an agreement, and that doing so "is impossible." When the Father mentions that he did give his permission to allow the Child to come to the United States, the Mother immediately dismisses this concession as insufficient because it was only for "two months" with the Father taking the Child thereafter.

Rather than supporting the Mother's contention that the Father had agreed to allow the Child to move to the United States, the messages are consistent with the Father's testimony that he only agreed to a limited trip. In accordance with the Father's testimony, the messages show that while the Father supported the Child having permanent residency status in the United States, he believed that in order to keep that status, the Child would need to travel to the United States a few times a year, not relocate here permanently.

About a month after the above disagreement, on August 10, 2017, the Mother informed the Father that she had "requested the judicial power to stipulate to an annual schedule for [the Child]. Unfortunately, you and I were not able to do it. Once the judge decides we would need to comply with his/her decision. I'm sorry for both." See Resp. Ex. 2R. The Father asked if the Child would return to Peru on the twenty-fifth, and the Mother responded that she "will await the judge's decision." Id.[14] When the Father asked again

---

[14] The Mother's reference to her request to the judicial power appears to be a reference to the Change of Residence Petition she filed in July of 2017. Although the Petition submitted into evidence is a subsequent petition, filed in October of 2017, it is significant to the Court that the Mother does not argue in this Petition that she brought the Child to the United States with the Father's permission for a permanent move. Notably, in the Petition, the Mother states that "the trip made to the USA by the undersigned and my minor child, is due to the travel permit granted voluntarily by the defendant, as the father of my minor child, which is temporary. This means that my residence is still in Peru, which is why I ask your Office to change the place of usual residence of my minor child." See Resp. Ex. 1 at 5. It is odd that the Mother would make this statement and not mention an agreement between the parties to a permanent move had one existed. Later, the Mother refers to an email she sent to the Father in January of 2017, as evidence that:

the Father is fully aware of the better opportunities that my minor child would have in the United States of America, which is why I sent him a schedule of visits, the same ones that I mention in the previous mention [sic]. In other words, the father of my minor child recognizes that the options of life of my son in the indicated foreign country are better than those he has here, but, and despite having some time consented to that trip, he changed his mind putting his personal interests before those of my minor child.

See Resp. Ex. 1. This lone reference to the Father's consent is not persuasive in the absence of any information as to when he consented, the extent of the consent given, and when he changed his mind. As

whether the Child would return on the twenty-fifth, the Mother stated "Just write to me if you want <u>to reach an agreement</u>. I would be happy to." <u>Id.</u> (emphasis added).  Later on that same day, the conversation between the parties continued as follows:

Father: That for the first time I was reaching an agreement with you
Mother: <u>What agreement?</u>
<u>We have never reach[ed] one</u>
Father: About the trip
Mother: You are dreaming
Father: Why do you minimize things
Mother: <u>What agreement?</u>
<u>Mafer, go for two months, then I will see when I give him back to</u>
<u>you?</u>
Father: Did I say that?
Or have I said that we will see so he doesn't lose his residency
And arrange his studies there
That's all we needed.
. . .

Mother: You want to keep him until he turns 8
Wtf?
I laugh at that idea
Father: That was the initial idea
Mother: Really?
What is the idea now?
You now want to make arrangements
How many times did I ask you for it?
I even cried
Before*
Look at all the things that one has to do to agree on something.
If we can agree.

---

previously noted, <u>see</u> supra note 10, the parties broke-up in May of 2017, such that any prior plans of moving to the United States are not persuasive evidence of what their understanding was at the time of the June 2017 departure.

Id. (emphasis added). The next day the Father asked the Mother to tell him her proposed schedule for the Child.[15] The Mother responded:

> June, July and August in Peru. Also, two weeks in December and two weeks in March. That is a total of 4 months in Peru. If you want more time it could be, but in two-weeks [sic] periods. . . . What I want to say with this is that [the Child] will study here. Not because it is my whim, and I hope that you can understand it one day. It is because this is the best for him in every aspect.

Id. To this proposal the Father stated, "Then // your idea from the beginning was that he would stay from this trip on," to which the Mother responded, "No. My idea was to agree on something. . . . But I asked you a bunch of times // And I got tired." Id. Once again, the Mother never suggests that the Father is reneging on some prior agreement between them, and explicitly states that the parties have never reached an agreement. Rather than insist that the Father adhere to some pre-existing arrangement, the Mother instead expresses her dissatisfaction with the previous understanding that the Child would spend a few months in the United States and then return to Peru, and insists on a new arrangement. Notably, when the Father accused her of always intending to stay in the United States with the Child "from this trip on," the Mother denied it, and said she intended for the parties "to agree on something." This response makes no sense if the parties had actually agreed to a permanent move prior to the trip as the Mother now contends in this action.

---

[15] The parties stipulated that this part of the conversation still took place on August 10, 2017. See Joint Stipulation (Doc. 40) ¶ 19. However, the original document plainly identifies the date of the conversation as August 11, 2017. See Resp. Ex. 2S at 163.

Finally, on August 24, 2017, the day before the Child was supposed to return to Peru, the Father asked the Mother: "Can you show me the baby's ticket? I know you won't want me to pick him up from the airport // But I want to know." See Pet. Ex. 11; Resp. Ex. 2W. The Mother responded: "We've talked about this." See Pet. Ex. 11. The Father continued: "I told you already that I'm ok with the baby staying there to study // But please keep your word." Id. The conversation proceeded:

> Mother: It seems you've forgotten what we talked about two weeks ago
> Roll up and read, if you've got something positive to say, let me know
> Father: Really, Mafer?
> Mother: ?
> Just sign the papers that need to be signed and there'll be no problem from now on, you're saying that you're ok with [the Child] studying here

Id. The Father resists her request to sign the papers, saying "I need to see him first, here."

Id. Later on in the discussion the Mother states: "I won't talk about this anymore // I've made up my mind // If you don't want to reach an agreement, it's a shame // We'll come to legal actions then // I'm not hiding." See id. The Father responded: "I made the hard decision of letting [the Child] go with you because I trusted you // And now you're getting it all wrong." Id. The Father offered to send "a voicemail that I agree that he stays there," if the Mother would allow the Child to return as planned, but the Mother refused, stating "No, thank you // Just sign // And the problem will be over." Id. The Mother accused the Father of lying to her, "[t]hat's why you don't want to sign what you're supposedly willing to sign." Id. This exchange is consistent with the Father's testimony that the Mother refused to return the Child to Peru unless the Father first agreed to let the Child live in the United

States.  In addition, these messages support the Father's testimony that, in an attempt to regain the Child, he told the Mother he would agree to allow the Child to live in the United States so long as the Child first returned to Peru as originally planned.

In addition to the Facebook messages, the Mother's contention that the parties shared a settled intention for the Child to permanently relocate to the United States is contradicted by her actions in filing a domestic violence claim against the Father the day before she was scheduled to depart with the Child to the United States.  In the claim, the Mother accused the Father of psychological mistreatment, specifically, "coming home in an intoxicated state at no appropriate visiting hours and showing an inappropriate behavior."  <u>See</u> Pet. Ex. 9.  The Mother "also stated that they had constant fights, for which [the Father] left the house, which is his mother's property, while she remained."  <u>Id.</u> Because neither party questioned the Mother as to the impetus behind her decision to file this claim, it is difficult to draw any definitive conclusions about the Mother's actions in this regard.  Nonetheless, even if the allegations in the claim are true, it is difficult to understand why the Mother would have felt the need to file the claim if she believed she and the Child were permanently relocating to the United States on the very next day, with the Father's knowledge and consent.  Moreover, given the existence of the claim and the allegations therein, the Court finds it implausible that the Mother and Father were sufficiently cooperating with each other at that time such that they could have reached a long-term agreement for the Child's future.

Based on the foregoing evidence, the Court is convinced that the Father never agreed to allow the Child to live in the United States. It may be that the parties had previously discussed such a move during their engagement, but when the relationship broke down, any such plans evaporated. Whatever their prior discussions may have been, the Father did not intend for the Child to move to the United States on June 13, 2017. Rather, the evidence shows that the Mother planned to move to the United States at that time, and the Father agreed to let the Child go with her, provided that the Child would return to Peru in August, as memorialized in the Consent to Travel Form. While the Mother may have hoped that once she and the Child were in the United States, the Father would capitulate to her demand that the Child remain with her, this was never the Father's understanding as to the purpose of the trip. Indeed, the contemporaneous Facebook messages between the parties make no reference to a prior agreement or understanding, and the Mother's own statements in those messages establish that the parties have never been able to agree on where the Child should live. In the Mother's own words, "[she] asked [the Father] a million times to come to an agreement and . . . [his] only answer was no, no, no, no." See Pet. Ex. 11.

Unable to convince the Father to see things her way, the Mother, who had long planned to move to the United States, unilaterally decided that the Child would remain with her in the United States. While the Mother may have formed this intention well before she left Peru with the Child, in the absence of shared parental intent, the Child's habitual residence remains in Peru. Thus, return of the Child is mandated under the Convention

unless the Mother can establish an affirmative defense.  See Baran, 526 F.3d at 1344.

However, the Mother's affirmative defenses fail for the same reasons—the Father never

agreed that the Child could move to the United States.

The Mother's argument that the Father consented to the Child's permanent

relocation to the United States is primarily based on his agreement with and participation

in obtaining permanent resident status for the Child.  However, in light of the Father's

testimony, as corroborated by the Facebook messages, it is apparent that the Father did

not believe that obtaining this status for the Child required the Child to live in the United

States.  The Father thought the Child could continue to live in Peru, while making periodic

trips to the United States.  Regardless of whether the Father's understanding is legally

correct, it is apparent the parties had never worked out an agreement regarding how much

time the Child would spend in each country.[16]  Thus, in allowing the Mother to include the

Child in her petition for permanent resident status, the Father was not also consenting to

the Child's subsequent permanent relocation to the United States.  Rather, the terms of

the Father's consent were expressly limited to a short-term trip from June 13, 2017, to

August 25, 2017.  This limited consent falls short of the standard for establishing consent

---

[16] During her closing argument, counsel for the Mother argued that the "main problem" here is about time—
"how long is the [C]hild going to be in the United States, how long is the [C]hild going to be in Peru. And at
that point, it's a timesharing issue."  See Vol. II Tr. at 33.  Counsel is correct, but her argument misses the
point.  The parties are indeed faced with difficult decisions as to how the Child should divide his time between
his parents and their countries of residence.  However, having failed to reach an agreement on their own,
this dispute must be resolved by the courts of the Child's country of habitual residence.  Absent any evidence
that the parties ever agreed to change it, the Child's habitual residence remains in Peru.  As such, it is up to
the courts of Peru to resolve the parties' timesharing dispute.  Indeed, the Mother appears to recognize as
much by virtue of the Change of Residence Petition she filed in Peru.

sufficient to defeat return under the Hague Convention. <u>See</u> <u>Baxter</u>, 423 F.3d at 372 (rejecting consent defense where father only agreed to the child staying with his grandmother in the United States for a few months while the family figured out where to go next).

Likewise, the Mother's argument that the Father subsequently acquiesced to the Child's change of residence is not supported by the evidence. As stated above, acquiescence requires an act or statement with some degree of formality, or a consistent attitude of acquiescence over a significant period of time. <u>See</u> <u>id.</u> at 371. Although the Father attempted to persuade the Mother to return by promising to sign an agreement, his consent was conditioned on her first returning to Peru, he never actually signed any formal document, and he denies that he would have done so had the Mother returned with the Child. Indeed, the Mother herself did not believe that the Father actually intended to sign such an agreement. As such, this case does not involve any formal act or statement of acquiescence. To the extent the Mother contends that the Father adopted an attitude of acquiescence because he did not object when she moved out of her apartment in Peru, got rid of her belongings, furnished the Child's room in the United States, enrolled him in daycare, and started working, this argument is unavailing. The Father's failure to object to these developments is not surprising given that the Father thought the Child would be frequently traveling to the United States in order to maintain permanent resident status. Moreover, the Father repeatedly implored the Mother to return the Child to Peru, and when she did not, he immediately began to seek the Child's return, first by attempting to obtain

a visa to come to the United States himself, and when that attempt failed, by pursuing his rights under the Hague Convention. Such actions undermine any suggestion that the Father adopted an attitude of acquiescence regarding the Child's retention in the United States. Id. at 372 (finding no evidence of acquiescence where the father gave only limited and conditional consent, and upon learning of the retention, "vigorously objected and pursued his rights under the [Hague] Convention").

## IV.    Conclusion

Although much of what transpired in the relationship between the Mother and Father is unclear, it is apparent to this Court that both parents love and care deeply for the Child. As such, the Court was hopeful when this case began that the parties could reach a resolution outside of Court that would secure the best interests of the Child. Nonetheless, as attempts at compromise have failed, the Court is called upon to decide this matter within the limited confines of the Hague Convention. Because the parties never shared a settled mutual intent to relocate the Child to the United States, the Child's habitual residence remains in Peru. Likewise, as the Father neither consented to a permanent move prior to the June 13, 2017 departure, nor acquiesced to a permanent retention after the departure, the Mother fails to establish an affirmative defense. Accordingly, the Hague Convention mandates the prompt return of the Child to Peru to allow the Child's country of habitual residence to resolve the ongoing custody dispute between the parties.

The Court concludes by noting that the circumstances of this case appear to have arisen out of each parent attempting to do what he or she truly believes is best for the Child.

Indeed, the love both parents have for their Child is obvious. In making the determination that the Child must be returned to Peru, the Court expresses no opinion as to what the best interests of the Child ultimately may be, such a determination is left to the courts of Peru. However, the Court is hopeful that despite what transpired in the past, both the Mother and Father will put the best interest of the Child first, and come to an agreement that will allow the Child to continue to grow up knowing and benefitting from the love and presence of both of his parents. In light of the foregoing, it is

**ORDERED**:

1. The Verified Petition for Return of Minor Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent (Doc. 1) is **GRANTED**.

2. Respondent Maria Fernanda Orbegoso Elias-Arata shall surrender custody of the Child, J.C.O., to Petitioner or his designee on or before **July 27, 2018**, for return to Peru.[17] Counsel for Petitioner shall coordinate arrangements for the Child's surrender with counsel for Respondent.

3. Counsel for Respondent, Glorian Maziarka, is **directed** to surrender the Child's travel documents to counsel for Petitioner so that the Child may travel to Peru.

---

[17] The Court selected this date in light of the Father's testimony that his current United States visa is valid through July 28, 2018.

4. Petitioner shall have up to and including **August 21, 2018**, to file any motion to recover necessary expenses incurred in this action pursuant to 22 U.S.C. § 9007(b)(3).[18]

5. The Clerk of the Court is directed to enter judgment accordingly, terminate all pending motions as moot, and close the case.

**DONE AND ORDERED** in Jacksonville, Florida, this 20th day of July, 2018.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record

---

[18] Pursuant to 22 U.S.C. § 9007(b)(3):

> [a]ny court ordering the return of a child pursuant to an action brought under section [9003] of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

While the Court understands that counsel represented the Father in this case pro bono such that an award of legal fees is not warranted, the Father may seek to recover his necessary costs and expenses, including the transportation costs related to the return of the Child.